**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Douglas E. Reuter,                                                    Civil No. 11-331 (SRN/SER)

        Plaintiff,

   v.                                                                    **MEMORANDUM OPINION**
                                                                          **AND ORDER**

Jax Ltd., Inc.,

        Defendant.

---

Aaron W. Davis and Tye Biasco, Patterson Thuente Christensen Pedersen, P.A., 80 South Eighth Street, Suite 4800, Minneapolis, MN 55402-2100, for Plaintiff.

Robert R. Weinstine and Brent A. Lorentz, Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

     This matter came before the Court on Defendant Jax Ltd., Inc.'s motion for a temporary restraining order against Plaintiff Douglas E. Reuter (Doc. No. 8). Since briefing was allowed by the Court by both parties and a hearing was conducted on the matter, the motion was converted into one for a preliminary injunction. So construed, this Court granted the motion as reflected in Jax's revised proposed Order, Reuter having agreed to the terms of that proposed Order with the exception of the amount of the bond. (Doc. No. 21.) This Memorandum Opinion and Order explains the Court's Order in greater detail.[1]

---

[1]     Following this Court's Order of March 18, 2011, Reuter requested that the
(continued...)

I.      FACTUAL AND PROCEDURAL BACKGROUND

Reuter and Jax originally entered into a License Agreement in June 1981, under

which Reuter granted Jax an exclusive license to manufacture, distribute and sell a board-

game, then known as Sequence Five, that Reuter asserted he invented.  That Agreement

was amended in January 1992.  Over the years, the original game and subsequent

variations on it–and Jax's efforts in distributing them–have been very successful.  The

relationship has generated substantial income for both parties.  And Jax, as Reuter himself

acknowledges, obtains some 80 percent of its revenue from distributing the games.  (Doc.

No. 1, ¶ 10.)[2]

The parties have a history of disputes regarding this Agreement and the games it

covers.  The 1992 amendment was entered, at least in part, to resolve a conflict between

the parties regarding distribution of the games through Target and Wal-Mart as well as an

earlier attempt by Reuter to terminate the Agreement due to Jax's alleged default.  And

litigation in 2005 in this district resulted in a temporary restraining order against Reuter.

Jax Ltd., Inc. v. Reuter, No. 05-CV-2658 (DWF/SRN), 2005 WL 3272060 (D. Minn.

---

[1](...continued)
Court reconsider its ruling and modify the preliminary injunction.  (Doc. No. 23.)  Jax
responded, arguing that no such modifications were necessary.  (Doc. No. 24.)  As this
opinion also explains, the Court denies the request to modify its existing injunction,
including the requirement that the "cure" provision is tolled.  Reuter agreed to that
provision, which was also applied in the 2005 litigation.  Jax Ltd., Inc. v. Reuter, No. 05-
CV-2658 (DWF/SRN), 2005 WL 3272060 (D. Minn. Nov. 28, 2005).

[2]        For a more detailed history of the parties' relationship, see Jax Ltd., Inc. v.
Reuter, No. 05-CV-2658 (DWF/SRN), 2005 WL 3272060 (D. Minn. Nov. 28, 2005).

Nov. 28, 2005).

Reuter filed the present action on February 9, 2011, claiming that Jax breached several terms of the License Agreement and seeking a declaration of its rights under that Agreement. (Doc. No. 1.) Reuter's request for relief includes a declaration that Jax had breached the Agreement and that "Reuter terminated the [Agreement] by providing written notice of such to Jax in accordance with the terms of the [Agreement]." (Id. at 15.) Moreover, Reuter seeks a declaration that he "may proceed with post-termination activity in relation to a contract breach by Jax" and that "the licensor-licensee relation between Reuter and Jax has ended." (Id. at 1.)

Granted, the Agreement provides that Reuter, upon Jax's failing to cure any default within thirty days of Reuter providing notice of such default, "may terminate [the] Agreement forthwith by so notifying [Jax]." (Doc. No. 1-1 (License Agreement), at 7.) And although Reuter purported to have terminated the Agreement in accordance with that contractual provision, he also expressly asserted that "[a]n actual controversy exists as Jax maintains it did not breach the contract and will dispute any termination." (Id. at 2.) Indeed, Reuter asserts that he filed the present declaratory judgment action because "Jax had steadfastly denied any wrongdoing." (Doc. No. 17, at 3.)

Jax's Answer included counterclaims seeking declaratory relief. (Doc. No. 6.) On March 11, 2011, Jax then filed a motion for a temporary restraining order, contending that Reuter's action was intended "to destroy Jax's business" by "circumvent[ing] the judicial process." (Doc. No. 10, at 1-2.) Jax asserted that Reuter had informed several of Jax's

3

customers that he already had terminated the Agreement, thereby jeopardizing the status

quo while the Court considers Reuter's request for a judicial declaration that the

Agreement has been terminated.  Thus, injunctive relief was necessary immediately

because "[b]y the time a trial on the merits has taken place, Jax's long-term relationships

with numerous sales representatives and retailers will likely already be irreparably

damaged, if not destroyed.  Jax's good name and reputation would be damaged." (Doc.

No. 10, at 16.)  This Court ordered Reuter to file a response to Jax's motion and set a date

for oral argument.  (Doc. No. 15.)

## II.   DISCUSSION

The *en banc* Eighth Circuit clarified the analysis for preliminary injunctive relief

in Planned Parenthood Minnesota v. Rounds, 530 F.3d 724 (8th Cir. 2008) (en banc).[3]

The court noted that under its earlier *en banc* decision in Dataphase Systems, Inc. v. C L

Systems, Inc., issuance of preliminary injunctive relief

> depends upon a "flexible" consideration of (1) the threat of irreparable harm
> to the moving party; (2) balancing this harm with any injury an injunction
> would inflict on other interested parties; (3) the probability that the moving
> party would succeed on the merits; and (4) the effect on the public interest.

Rounds, 530 F.3d at 729 (citing 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  With

respect to succeeding on the merits, the Rounds court clarified that unless the movant is

seeking to enjoin "government action based on presumptively reasoned democratic

---

[3]      As noted above, because the Court heard oral argument after briefing from
both sides, Jax's original request for a temporary restraining order was converted into one
for a preliminary injunction.

processes," courts "should still apply the familiar 'fair chance of prevailing' test." Id. at

732.[4]  The "fair chance" standard is less demanding than the "likely to prevail" standard

applicable to injunctions sought against governmental action such as a statute, and a "fair

chance of prevailing" does not require a greater than fifty per cent likelihood of

prevailing on the merits.  See Rounds, 530 F.3d at 731 (quoting Dataphase, 640 F.2d at

113).[5]

Here, Jax has demonstrated a "fair chance" of prevailing on the merits.  On the

present preliminary record, Jax has raised serious questions as to whether the Agreement

has been violated, and if so, by which party.  (Doc. No. 6 (Answer and Counterclaims)

(seeking rescission of the Agreement and disgorgement of royalties paid to Reuter

because  "Reuter never had the rights which he warranted to Jax at the time he entered"

the Agreement); Doc. No. 10 (claiming that Reuter's claims are "baseless").)  At a bare

---

[4]      Reuter, however, argued that Jax must be held to the higher standard
applicable only to challenges aimed at certain governmental actions.  (Doc. No. 17, at 7.)

[5]      The application of the four-factor analysis must be a "flexible" one.
Rounds, 530 F.3d at 729 n.3.  Thus any "effort to apply the probability language with
mathematical precision is misplaced."  Dataphase, 640 F.2d at 113.  The Seventh Circuit,
applying the same four factors, has noted that under its "sliding scale approach," "'the
more likely it is that [movant] will succeed on the merits, the less the balance of
irreparable harms need weigh towards its side; the less likely it is the [movant] will
succeed, the more the balance need weigh toward its side.'"  Sofinet v. INS, 188 F.3d
703, 707 (7th Cir. 1999).  "Although there is thus a minimum threshold for likelihood of
success," the threshold "is a low one: '[i]t is enough that the [movant's] chances are
better than negligible.'"  Id. (internal citations omitted).  But "[t]he less compelling the
case on the merits, the greater the showing of irreparable harm must be."  Id.  See
generally 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.3 (2d
ed. 1995) (explaining relationship between success on the merits and irreparable injury).

minimum, Jax has as much of a chance of success on the merits as does Reuter.

The other key factor in any analysis of preliminary injunctive relief is irreparable harm. Chicago Stadium Corp. v. Scallen, 530 F.2d 204, 206 (8th Cir. 1976). Indeed, "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" Rounds, 530 F.3d at 732 n.5. Thus lack of irreparable harm will usually preclude preliminary injunctive relief regardless of the other factors. Dataphase, 640 F.2d at 114 n.9 ("[T]he absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction.").

Here, the Court finds that Jax has shown it likely would suffer irreparable harm absent the preliminary injunction. The Court recognizes that the licensing Agreement between the parties reflects a commercial enterprise producing substantial income for both parties. But the particular facts of this case refute any argument that damages alone would suffice to compensate Jax if this Court were not to issue such injunctive relief.

Jax is a family business that derives about 80 percent of its revenues from sales of the games under the Agreement. Moreover, this licensing relationship has existed for almost thirty years. As recognized by the court in the parties' earlier litigation in this district, any unilateral non-judicial termination of the relationship by Reuter before this Court addresses the merits could likely inflict irreparable injury on Jax. Jax Ltd., Inc. v. Reuter, No. 05-CV-2658 (DWF/SRN), 2005 WL 3272060, *4-5 (D. Minn. Nov. 28, 2005) (finding that denial of TRO "would be potentially devastating to Jax"). Cf. Ryko Mfg. Co. v. Eden Servs., 759 F.2d 671, 673 (8th Cir. 1985) (affirming injunction against

6

termination of distributorship contract that would possibly force distributor, which

derived 95% of its revenues from agreement with manufacturer, out of business, whereas

manufacturer's loss was compensable with damages).

Furthermore, allowing Reuter to communicate with Jax's customers and claim that

the Agreement already has been terminated–because Jax allegedly has engaged in

deceptive conduct and misappropriation–would likely jeopardize Jax's business in a

manner not compensable by damages.  Gelco Corp. v. Coniston Partners, 811 F.2d 414,

420 (8th Cir. 1987) (noting that irreparable harm has been found where non-movant's

actions "will cause another's ongoing business to terminate absent an injunction").[6]

Indeed, Reuter argues that Jax "has shattered [their] long-term business relationship . . .

by secrecy, deception and misappropriation," contending that this action is about Jax's

"bad faith and betrayal."  (Doc. No. 17, at 1.)

But having filed this action for declaratory relief regarding the parties' rights and

obligations under that contract–and seeking a judicial declaration that the Agreement is

terminated–Reuter must await this Court's decision on the merits.  Failure to prohibit him

from engaging in such communications before that decision issues would irreparably

damage Jax's customer relationships and other intangible business interests.  Thus, the

---

[6]     Reuter argues that the royalties Jax earns from two sub-sublicenses are a
small fraction of annual sales. (Doc. No. 17, at 11.)  But Jax does not premise its request
for injunctive relief on its loss of income from particular sources in any given year.  Jax
contends that Reuter's actions will destroy the business relationships Jax has spent thirty
years developing.  "[N]o legal remedy can mend damaged or destroyed business
relationships." Vital Images, Inc. v. Martel, No. 07-CV-4195 (DWF/AJB), 2007 WL
3095378, *7 (D. Minn. Oct. 19, 2007).

harms at issue here go beyond lost sales that could be remedied with damages alone.

The third factor, the balance of harms, also favors Jax. Reuter argues that granting the injunction Jax requests "would effectively prevent Reuter from conducting any discovery to prosecute his case against Jax." (Doc. No. 17 at 11; Doc. No. 23.) Reuter misunderstands the nature of the injunction at issue. The Court's injunction is directed solely at Reuter himself. Jax agrees that the injunction "applies to Reuter and not his counsel." (Doc. No. 24.) Any prohibition on Reuter communicating with Jax's customers will in no way limit or otherwise interfere with the ability of Reuter's counsel to conduct discovery and litigate this action.

In addition, requiring the parties to maintain their contractual obligations pending a final ruling on the merits imposes little, if any, harm on Reuter, as Jax will be bound to continue paying Reuter royalties on the sales Jax generates. Jax Ltd., Inc. v. Reuter, No. 05-CV-2658 (DWF/SRN), 2005 WL 3272060, *4-5 (D. Minn. Nov. 28, 2005) (noting that TRO would simply require Reuter to "remain in the same position that he has been in for the past 24 [now 30] years, continuing to receive royalty checks"). Thus, the balance of harms clearly weighs in Jax's favor.

The final factor is the public interest. Reuter contends that "[t]he public interest is served by having parties abide by their contracts." (Doc. No. 17 at 13.) Granted, that interest is valid. And Jax agrees that contracts must be honored. (Doc. No. 10, at 22.) Indeed, Jax alleges that Reuter has breached the Agreement between them, such that the

8

policy of enforcing contracts could cut either way.[7]  But the merits of any such arguments

remain to be decided.

Moreover, the contract dispute here is largely, if not entirely, private.  Apart from

the abstract principle that valid contracts should be enforced, the dispute does not

implicate a contract with public ramifications, much less any non-contractual issues of

public concern, such as product safety.  Thus, the relevant weight of that factor in the

overall flexible analysis, whichever way the issue of breach is ultimately resolved on the

merits, is minimized here.

In sum, in this dispute over a licensing relationship that has lasted some thirty

years, and which provides Jax with some 80 percent of its revenues, allowing Reuter to

represent to Jax's customers that he already has terminated the relationship, despite

having brought this action to obtain a judicial declaration of that termination, would

inflict irreparable harm upon Jax.  Moreover, enjoining Reuter from such actions pending

a resolution of the merits would not impose much, if any, harm on him as Jax would be

required to continue to fulfill its obligations under the license, including that it pay Reuter

royalties from the sales Jax would continue to be obligated to generate.  With the public

interest factor essentially neutral, Jax's strong showing of irreparable harm, particularly

when compared to the negligible harm the injunction would impose on Reuter, coupled

---

[7]     Two of Jax's counterclaims, while formally seeking declaratory relief, are
premised on allegations that "Reuter breached his contractual obligation[s]" to fully
cooperate with Jax in developing the game, and to notify Jax of any potential
infringements. (Doc. No. 6, at 22-23.)  Jax also claims that Reuter misrepresented his
ownership of the rights to the game. (Id. at 25.)

with Jax's "fair chance of success" on the merits–which again does not require that

success is "likely" or even greater than fifty percent–shifts the balance decisively in favor

of issuing the injunction in favor of Jax.

The injunction is thus necessary to preserve the status quo of this long-standing

business relationship pending this Court's decision on the merits.  Having filed this action

seeking a declaration by this Court of the parties' respective contractual rights, Reuter

cannot contend that the status quo encompasses his termination of the Agreement before

this Court rules on that issue.  Contrary to Reuter's argument that Jax now improperly

"seeks to go back in time to recapture an earlier status quo" (Doc. No. 17 at 14), Reuter

essentially asks this Court to shift forward in time and reflexively assume that Reuter's

position on the merits is a foregone conclusion for this Court to simply rubber-stamp.[8]

Finally, the Court notes that Jax now has filed the $100,000.00 bond as required by

this Court's earlier Order.  (Doc. No. 25.)  Reuter asks this Court to increase the amount

of security.  (Doc. No. 23.)  The court denies the request, having concluded that the bond

as originally ordered suffices to compensate Reuter for "the costs and damages" it would

sustain if this Court's injunction would be found to have "wrongfully enjoined" Reuter.

Fed. R. Civ. P. 65(c).  Reuter has not demonstrated that more security is necessary,

---

[8]     This is not a case where the movant asks the Court to go back in time with
respect to *facts* that have already occurred.  Cf. Cenveo Corp. v. Southern Graphic
Systems, Inc., No. 08-CV- 5521 (JRT/AJB), 2009 WL 161210, *3 (D. Minn. Jan. 22,
2009) (refusing to require movant's former employees, who left movant's employ "some
time ago," "to return to their old . . . jobs").  Rather, Reuter's version of the status quo
concerns a *legal* determination, one that he purports to have made himself despite filing
this action seeking a judicial determination of the issue.

particularly in light of the fact that Jax remains obligated to distribute the games pending

this Court's decision on the merits.

The Court thus discerns no basis to deviate from the terms of the injunction as

originally issued in its Order of March 18, 2011.

## III.   ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that the Court reiterates the terms of the preliminary injunction as

originally stated in this Court's Order of March 18, 2011 (Doc. No. 21).


Dated:   March 29, 2011                               s/ Susan Richard Nelson
                                                      SUSAN RICHARD NELSON
                                                      United States District Judge