UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas E. Reuter, | Civil No. 11-CV-331 (SRN/SER) |
| Plaintiff, | MEMORANDUM AND ORDER |
| v. | |
| Jax Ltd., Inc., | |
| Defendant. | |

Aaron W. Davis, Eric H. Chadwick, and Tye Biasco, Patterson Thuente Christensen Pedersen, PA, 80 South 8th Street, Suite 4800, Minneapolis, Minnesota 55402; and Dennis D. Reuter, 3416 Angie Circle, Coeur D'Alene, Idaho 83815, for Plaintiff.

Brent A. Lorentz and Robert R. Weinstine, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, Minnesota 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 34], and Plaintiff's Motion for Leave to File Reply/Surreply [Doc. No. 60]. For the reasons that follow, Defendant's Motion is granted and Plaintiff's Motion is denied.

**I.     BACKGROUND**

Plaintiff Douglas Reuter created a board game named "Sequence Five," which is now called Sequence®, and granted Defendant Jax Ltd., Inc. ("Jax") a worldwide license to sell the game in exchange for royalties (the "Agreement"). (Levine Decl. ¶¶ 3-4.) The Agreement was first signed in 1981. (Id. Ex. A.) In early 2003, Jax entered into an oral agreement with Anjar Company ("Anjar"), an international licensing company, to seek out and grant sublicenses to companies worldwide that would, in turn, manufacture and distribute the board game. (Id.

¶¶ 17-18.) In 2005, Anjar exercised that authority by granting sublicenses to two foreign manufacturers: Gudjon Gudmudsson of Nordic Games ("Nordic Games") and Ventura Games Proprietary Limited ("Ventura Games"). (Id. ¶ 19; Reuter Decl. Exs. 2-3.)

On March 15, 2010, Jax and Anjar terminated their agreement; Anjar thus ceased to be Jax's licensing agent. As part of that termination, Jax was directly assigned the sublicense agreements that Anjar had negotiated with Nordic Games and Ventura Games. That assignment took effect on January 1, 2011. (Levine Decl. ¶ 22.) After acquiring the sales records from Anjar for the period of March 1, 2004 to March 31, 2010, Jax noted that it owed royalty payments to Reuter for some of that period of time. Jax tendered to Reuter the appropriate amount, with interest, and made further payments through January 2011. (Id. ¶¶ 25-26, Ex. C.) Reuter purportedly accepted the initial payment "without waiver."

In addition, Jax learned in January 2010 that the Sequence® board game was being sold by Wal-Mart in Canada. These sales had not been authorized by Jax. Anjar sent a cease and desist letter to Wal-Mart on behalf of Jax in an attempt to remedy the issue. (Levine Decl. ¶ 28.) Reuter learned of these unauthorized sales in February 2010, but did nothing except commission two friends to procure Sequence® games from two Canadian Wal-Mart stores to verify that such sales were occurring. (Reuter Decl. ¶ 11.) In May 2010, Jax learned from Reuter that Wal-Mart was still selling Sequence® products. (Id. ¶ 12; Levine Decl. ¶ 29.) Jax then took additional action and demanded that Wal-Mart stop selling Sequence® games. Wal-Mart finally ceased Sequence® sales in August 2010. (Levine Decl. ¶ 30.)

On October 13, 2010, Reuter notified Jax that he believed that Jax was in breach of their contract because "a secondary sublicense seem[ed] to exist" between Jax and Anjar. (Reuter

2

Decl. Ex. 5.) Then, on February 9, 2011, Reuter attempted to terminate the Agreement on the basis of Jax's alleged default. (Id. Ex. 6.)

## II. DISCUSSION

Reuter raises two Counts in his Complaint: Count I alleges that Jax entered into unauthorized sublicenses and thus breached the Agreement; Count II alleges that Jax breached the Agreement by failing to notify Reuter of prohibited sales of Sequence® by Wal-Mart. Jax seeks summary judgment on both Counts, advancing several arguments in favor of its motion. The arguments as to each Count will be discussed below.

### A. Standard of Review and Contract Construction

Summary judgment is appropriate where there are no genuine issues of material fact and the case can be decided as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of proof and the evidence must be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Yet "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256.

"The cardinal purpose of construing a contract is to give effect to the intention of the

3

parties as expressed in the language they used in drafting the whole contract." <u>Art Goebel, Inc. v. N. Suburban Agencies, Inc.</u>, 567 N.W.2d 511, 515 (Minn. 1997) (citation omitted). Contract construction is a question of law for the Court to determine, unless a disputed provision is ambiguous. <u>Id.</u> Because the Agreement provisions relevant to this matter are not ambiguous and the salient facts are not in dispute, summary judgment is appropriate.

      **B.**      **Count One: Sublicenses**

Reuter asserts that Jax inappropriately granted sublicenses in direct violation of the Agreement and, therefore, the Court should hold that Reuter may terminate the Agreement. Jax proffers several arguments in response, including that its sublicenses were expressly allowed under the Agreement and that any breach of the Agreement was not material and therefore termination is not warranted.

As to Jax's first argument—that its sublicenses were authorized under the Agreement—the main issue for this Court to determine is how the Jax-Anjar relationship should be characterized: as one of licensor-sublicensee or principal-agent. The Agreement gives Jax "[t]he right, in [Jax's] sole discretion, and on such terms and conditions as [Jax] deems appropriate, to sublicense persons, firms, or corporations not affiliated with [Jax] to manufacture, distribute and sell the Licensed Product outside the United States." (Levine Decl. Ex. A sec. 2(b).) In a subsequent Letter of Understanding sent from Jax to Reuter in March 2003, which was then ultimately signed by Reuter, the parties acknowledged that "there shall not be authorization for a sublicensee to further sublicense the licensed product." (<u>Id.</u> Ex. B at 1.) Notably, the Letter of Understanding contemplates that "[t]he sublicensee shall be the entity [that] directly or indirectly sells the licensed product in the wholesale market." (<u>Id.</u> Ex. B at 1.)

Reuter argues that Anjar was a sublicensee under the Agreement, and that by allowing Anjar to enter into sublicenses, Jax violated the Letter of Understanding's prohibition on further sublicenses. Jax contends that it hired Anjar as its licensing agent—namely, to pursue licensing agreements on Jax's behalf. Indeed, Jax argues that Anjar never manufactured, distributed, or sold Sequence®, and therefore Anjar does not qualify as a sublicensee under the Agreement.

This issue would be much easier to resolve if Jax and Anjar had reduced their relationship to writing. As noted above, they did not do so. Therefore, Reuter points to Anjar's licensing agreements with Ventura Games and Nordic Games to illustrate his point. In those agreements, Anjar avers that it "[o]wns or has acquired the rights to the [board game]," including "copyrights, trademarks and other rights in the design, style, character, likeness, and appearance of the material, packaging, and accessories related thereto." (Becker Decl. Exs. A, B at 1.) Those agreements also prohibit Ventura Games and Nordic Games from selling the board game on the internet or distributing it as a premium item, and also vests Anjar with quality control functions.

It is quite true that if one were to look at only Anjar's agreements with Ventura and Nordic Games, it might appear that Anjar itself was granting a sublicense. (But see id. Ex. A at 3, Ex. B. at 2 (stating that advances and royalties paid by Ventura Games and Nordic Games will be split 50-50 between Jax and Anjar).) But it is equally true that if the Jax-Anjar relationship is one of principal-agent, as Jax claims, then it makes perfect sense that Anjar would exercise the above-listed controls over Ventura Games and Nordic Games because it would be standing in Jax's shoes as the official licensor. Reuter's arguments are valid only if one assumes that Anjar obtained a sublicense from Jax in the first instance and thus Reuter begs the original question:

how should the Jax-Anjar relationship be characterized?

To answer that question, the Court must "give effect to the intent of the parties to the contract." Davis v. Outboard Marine Corp., 415 N.W.2d 719, 723 (Minn. Ct. App. 1987) (citing Karim v. Werner, 333 N.W.2d 877, 879 (Minn. 1983)). "To infer the parties' intent, the court should look to (1) circumstances surrounding the making of the contract and (2) the parties' own subsequent interpretations of the contract." Id. at 723-24 (citation omitted). Thus, Reuter's analysis of Anjar's agreements with Ventura Games and Nordic Games is inapt; the Court must look only to the actions of the parties to the Agreement—Jax and Anjar—in interpreting their contractual relationship.

Because Jax and Anjar did not reduce their relationship to writing, it is difficult to discern the parties' intent at the time the contract was made. There is, however, evidence of how the parties subsequently interpreted their relationship. Indeed, the only adducible evidence on the Jax-Anjar relationship, which was put forth by Jax, is that Anjar acted solely as Jax's licensing agent. (See Becker Decl. ¶¶ 4-13.) An email written by an Anjar company officer even describes Anjar's role as that of "international licensing agent." (Id. Ex. C.) Reuter has proffered nothing to counter this evidence; therefore, the Court finds that no reasonable fact finder could draw an inference that Anjar was Jax's sublicensee. Anjar's agreements with Ventura Games and Nordic Games were not impermissible secondary sublicenses, and Jax is granted summary judgment on Count One.

Even if a technical breach of contract occurred, Jax argues that it cured any default and thus Reuter may not terminate the Agreement. The Agreement states the following:

> In the event that Licensee defaults in the performance of any of the terms of this Agreement and such default is not cured within thirty (30) days after noticed

>       thereof from Licensor, Licensor may terminate this Agreement forthwith by so
>       notifying Licensee.

(Levine Decl. Ex. A pt. 9(a).)  Reuter gave Jax notice of the purported default on October 13, 2010.  Yet earlier that year, on March 15, 2010, Jax had terminated its agreement with Anjar, and, effective January 1, 2011, Jax was assigned the agreements that Anjar had entered into with Ventura Games and Nordic Games.  (Levine Decl. ¶ 22.)  Therefore, on January 1, 2011, because Anjar was no longer in the picture, no "secondary sublicenses" existed.

Assuming a breach, Reuter might have been within his rights to terminate the Agreement 30 days after he sent notice of the purported breach on October 13, 2010.  He did not, however, seek to terminate the Agreement until February 9, 2011.  Thus, Jax had cured any default more than a month before Reuter sought to terminate the Agreement.

Reuter counters that Jax's breach lies not only in the fact that secondary sublicenses were authorized, but that they were authorized without Reuter's knowledge and permission.  Reuter argues that Section 8 of the Agreement requires the parties to "fully cooperate with each other," and thus Jax breached the Agreement by not allowing Reuter to assist in remedying the secondary sublicense breach.

Reuter's argument is without merit.  Indeed, even assuming that the Jax-Anjar relationship was a sublicense, and thus that the Anjar-Nordic Games and Anjar-Ventura Games sublicenses were impermissible, the Agreement does not require Jax to seek Reuter's counsel before entering into sublicenses.  Indeed, Jax is given a great amount of autonomy to sublicense the manufacture, distribution, and sale of Sequence®.  (See Levine Decl. Ex. A sec. 2(b) (vesting Jax with "sole discretion" to issue sublicenses on these functions).)  The section of the Agreement on which Reuter relies to support his argument, section 8, discusses cooperation

between the parties in the context of "actions or proceedings," or matters "incident" thereto; it does not contemplate a consultation before every conceivable business decision the parties might make. Thus, even if the Anjar sublicenses were secondary sublicenses, Jax cured this breach before Reuter sought to terminate the Agreement.

Finally, even if a technical default of the Agreement had occurred, Reuter still cannot show that the default was material such that the drastic remedy of termination is appropriate. "[A] breach [i]s material when 'one of the primary purposes' of a contract [i]s violated." Skoberg v. Huisman, No. C7-02-2059, 2003 WL 22014576, at *3 (Minn. Ct. App. Aug. 19, 2003) (quoting Steller v. Thomas, 45 N.W.2d 537, 542 (Minn. 1950)). In other words, a material breach is one "that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract . . . ." Id. at *2 (citation and internal quotation marks omitted). Indeed, "even when express conditions of the contract are violated, the breach is not necessarily material." Id. at *3 (citation omitted). This is true even where, as in this case, the contract at issue contains a clause that allows for termination on the basis of any breach. See id.

Although "[t]he materiality of a breach is a question of fact," id. at *2 (citation omitted), where no reasonable fact finder could find that a particular breach defeated the essential purpose of the contract, the Court may hold as a matter of law that the breach was not material. See, e.g., LeMond Cycling, Inc. v. PTI Holding, Inc., No. 03-5441, 2005 WL 102969, at *4 (D. Minn. Jan. 14, 2005) (Magnuson, J.). Indeed, in LeMond Cycling the Court found that the primary purpose of the contract was to allow the defendant "to develop, produce, market and distribute bicycle accessories under [the plaintiff's trademark]" in exchange for an annual payment plus additional royalties. Id. The plaintiff argued that the defendant was in material breach because the

defendant failed to submit annual marketing and media plans as well as sales reports and projections. Id. Judge Magnuson held that the defendant's failure "to give reports or other documents [to the plaintiff] . . . [did] not frustrate the essential purpose of the contract" because there was "no causal connection" between the defendant's technical breach and the plaintiff's "alleged lost profit damages." Id.

Similarly, in this case the primary purpose of the Agreement was to allow Jax to manufacture and distribute Sequence® in exchange for royalties to be paid to Reuter. Further, like in LeMond Cycling where the defendant's failure to disclose documentation to the plaintiff did not affect the plaintiff's alleged lost profits, in this case Jax's alleged secondary sublicenses did not result in any damages to Reuter. Indeed, there is no evidence in the record to suggest that Jax owes Reuter any back royalty payments, and Reuter has failed to demonstrate any other harm he has incurred.[1] Thus, any breach that occurred was not material and summary judgment is appropriate on Count One.

### C.    Count Two: Failure to Notify of Wal-Mart Sales

Reuter next claims that, by not informing him of Sequence® sales by Wal-Mart in Canada,[2] Jax violated the Agreement and thus the Court should hold that Reuter may terminate

---

[1] Reuter makes a speculative argument that he may have incurred pecuniary harm by the loss of control of his product. This argument is unavailing. As the undersigned noted at oral argument, if Reuter believed that further factual development would reveal such pecuniary harm, the proper course of action would have been to file an affidavit under Federal Rule of Civil Procedure 56(d) (formerly Rule 56(f)) rather than respond to Jax's Motion. On this record, there is no evidence of any such pecuniary harm.

[2] In his Motion for Leave to File Reply/Surreply, Reuter seeks to introduce brand new disputed evidence of the alleged continued sale of Sequence® in Wal-Mart stores. (Mem. Supp. Mot. for Surreply at 1.) As noted above, however, the proper course of action would have been for Reuter to file an affidavit under Federal Rule of Civil Procedure 56(d). The Court will thus

the Agreement. Jax counters that it did not breach the Agreement with respect to the Wal-Mart sales and, even if it did, such a breach was not material and thus termination is inappropriate.

Reuter again cites section 8 of the Agreement in support of his argument that Jax did not seasonably "notify" Reuter of the unauthorized Wal-Mart sales, and thereby did not "fully cooperate" with Reuter in addressing such sales. (Levine Decl. Ex. A sec. 8.) As noted above, and as Jax argues, this provision is intended to foster full cooperation between the parties by requiring them to "execute any documents required by either, and keep each other apprised of all matter incident to . . . actions or proceedings." (Id.) Yet in the context of Reuter's unauthorized Wal-Mart sales claim, this provision requires more than just cooperation in the execution of a legal action. Indeed, section 8 states that, "[i]n the event of any apparent unauthorized use or infringement or imitation by others of the [board game] which may come to [either parties'] attention, the parties shall notify each other of such infringement . . . ." (Id.) Thus, it is clear that Jax had a duty to seasonably notify Reuter of any unauthorized sales.

As noted above, Jax apparently learned of the unauthorized Wal-Mart sales on January 12, 2010. Reuter learned of those same sales no later than February 18, 2010. Jax, however, failed to notify Reuter of those sales and did not discuss the ramifications of such sales until Reuter broached the subject in May 2010. Reuter, however, likewise failed to notify Jax of his knowledge of the unauthorized sales for several months. Jax argues that Reuter cannot accuse Jax of breaching the duty to notify when Reuter himself appears to have done so.

Indeed, far from being harmed by the Wal-Mart sales, Reuter appears to have been working to exploit his knowledge of them. As noted above, Reuter apparently asked two friends

---

not entertain Reuter's Motion.

in Canada to go to Wal-Mart and procure Sequence® so that Reuter would have the proof he needed to terminate the Agreement.  On February 24, 2010, Reuter wrote the following in an email: "The receipt is priceless—it says Wal-Mart on it and it also says the item bought is Sequence!!!!"  (Levine Decl. Ex. 7.)  Even more revealing is an email Reuter wrote just a day earlier, which states, in part: "Armed with your purchase, my lawyers are moving forward."  (Id. Ex. 6.)  In May 2010, Reuter contacted Wal-Mart and sought "an opportunity to talk to whoever is the head buyer for games at Wal-Mart . . . to see if Wal-Mart is interested in carrying Sequence in its stores."  (Id. Ex. 5.)  The record evidence thus demonstrates that Reuter was actively seeking an opportunity to make the Wal-Mart sales "happen," but wanted assurance that a deal would be consummated "before [Reuter] expend[ed] any energy with Jax (manufacturer) . . . ."  (Id.)

It is axiomatic that "[t]he right to rescind must be exercised promptly upon discovery of the facts from which it arises for the reason that under the law it may be waived by continuing to treat the contract as a subsisting obligation."  Gaertner v. Rees, 107 N.W.2d 365, 368 (Minn. 1961) (citations omitted).  Although "immediate notification of intent to rescind is not neccessary[,] notification is . . . required to be prompt."  Baehr v. Keith R. Holton Enters., No. 96-909, 1997 WL 76321, at *2 (Minn. Ct. App. Feb. 25, 1997).  In this case, not only did Reuter withhold his own knowledge of the Wal-Mart sales from Jax for at least three months, but he was working to capitalize on those sales behind Jax's back.  Thus, even if Jax breached the Agreement by failing to notify Reuter of the Wal-Mart sales, Reuter waived such a breach by likewise failing to promptly notify Jax and by using his knowledge to subvert Jax's interest in continuing the Agreement.  Moreover, after Reuter notified Jax of Wal-Mart's sales in May

11

2010, while Jax actively worked to get Wal-Mart to stop those sales, Reuter continued cultivating a relationship with Wal-Mart in hopes of capitalizing on the Agreement's future termination. Reuter will not be allowed to rescind under such circumstances.

Finally, the Court again holds that, even if Jax technically breached the Agreement by failing to notify Reuter of the Wal-Mart sales, such a breach was not material. As noted above, the primary purpose of the Agreement was Jax's manufacture and distribution of Sequence® in exchange for royalty payments to Reuter. Reuter has demonstrated no harm that resulted from sales of Sequence® by Wal-Mart, let alone the requisite "causal connection" between such sales and any harm he may have suffered. LeMond Cycling, 2005 WL 102969, at *4. In fact, Reuter recognized the potential value of partnering with Wal-Mart because he was actively recruiting Wal-Mart to sell Sequence®. Summary judgment is thus appropriate on Count Two.

## III. CONCLUSION

No genuine issue of material fact exists as to either Count One or Count Two.

**THEREFORE, IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for Summary Judgment [Doc. No. 34] is **GRANTED**; and

2. Plaintiff's Motion for Leave to File Reply/Surreply [Doc. No. 60] is **DENIED**.

Dated: September 6, 2011            s/ Susan Richard Nelson
                                    SUSAN RICHARD NELSON
                                    United States District Judge